## JOHN GREGORY v. HIRAM ATKINS.

### Libel.   Evidence.   Pleading.

Where the publication contains a direct and specific libelous charge, matter justifying it, as that the truth of the charge will be relied upon and proved, limits and confines the party in his proof to that very issue.

Where the charge was swindling, and the notice of matters in justification was of a transaction entered into by the plaintiff with intent to defraud, etc., which would, if proved, be a justification, it was held that a deposition proving the transaction, but failing to show any fraudulent intent, which was the essence of the offense, was properly excluded, there being no other evidence offered in aid of the deposition.

Where the publication consisted of specific charges of acts and conduct, other acts in justification, outside of those charged, do not answer or meet the *gravamen* of the complaint, and evidence of them should be excluded.

Where the plaintiff does not claim to recover under so broad a construction of the libel as the evidence offered implies, but only for charges of particular acts of misconduct, or acts of misconduct of the character charged in the publication, evidence of other acts should be excluded.

The legal quality of an alleged libel is a question for the court to determine; therefore it was held proper for the court to tell the jury that a certain portion, specified in the publication in question, was clearly a libel, if published in the sense alleged in the declaration, explaining to the jury wherein it was so.

The province of a jury in an action of this character is to find, whether or not the publication was made by the defendant, whether it was with malicious intent and false, and whether its sense and meaning are as set forth in the declaration.

The declaration in this case held sufficient upon motion in arrest.

ACTION on the case for an alleged libel on the plaintiff, published in a newspaper called the Argus and Patriot, printed and published at Montpelier. The defendant pleaded the general issue, and gave notice under the statute of special matter in defense. Trial by jury, and verdict for the plaintiff, March term, 1869, PECK, J., presiding.

The plaintiff on his part offered in evidence, a number of said paper, which, from its date, appeared to have been published July 25, 1867, and also introduced proof tending to show that the defendant was the editor and publisher of said paper; also that said paper was printed and published at the defendant's office in Montpelier; and then offered proof tending to show that he is a regularly ordained Minister of the Gospel, of the Universalist denomination, and that he was ordained in 1833, in pursuance of the custom of said denomination, and that, with the exception of about

one year, he had ever since been in regular standing with said denomination; that he is, and has been for the last seven years, assistant assessor of internal revenue, under the laws of the United States; and was president of the Vermont agricultural society from January 1, 1867, to January 1, 1869.

The defendant on his part, and in support of the issues presented by his notice, offered in evidence the deposition of one F. A. Wright, which was objected to by the plaintiff as not tending to prove the issue, and also because the original note mentioned by the deponent was not produced, and because the deponent does not state that the copy annexed or referred to by the deponent is a copy of the original note. The court decided that the deposition was inadmissible, unless the counsel proposed to show something else in connection with it, so as to make it tend to justify some part of the libel, in justification of which it was offered. The defendant's counsel not stating that they expected to offer any evidence in connection with or in aid of it, the court excluded the deposition; to which the defendant excepted.

The defendant in putting in his defense called the plaintiff as a witness, and proposed to ask him if he did not intermarry with Maria Averill, some time between 1828 and 1836, while he had another wife, named Ellen, still living; and the counsel of the defendant stated that they expected to prove by him (the plaintiff) that he was married to Ellen Bantan about 1828, and that after living with her as his wife a while, and while a petition for divorce was pending to dissolve his marriage with the said Ellen, said Ellen still being at that time alive, he married Maria Averill, with whom he has ever since cohabited as his wife, and that said petition was never heard.

To this the plaintiff objected: that it did not tend to justify any portion of the libel under the notice; that the libel was confined to imputations against the plaintiff's conduct within the last twenty years next previous to the date of the libel, and therefore particular acts of the plaintiff prior to that period of time could not be admitted in justification; and also claimed that notwithstanding the libel contained some general imputations against the plaintiff's character, yet in its construction it was limited and confined to

the specifications mentioned in the libel, to the particular acts of misconduct, or to the acts of misconduct of the particular character specified in the libel : such as exciting a drunken crowd to mob men, etc., traveling over the country and inventing and publishing slanders, swindling, etc.; and that the plaintiff did not claim to recover upon any broader construction of the libel, or upon any part of the publication, except the part that was thus specified, and insisted that this proof thus offered did not come within the construction of the libel, and, therefore, was not admissible in justification. The plaintiff also claimed that he was privileged from answering the question and from testifying as to the matters so proposed to be proved by him.

The court sustained the objection, and the inquiries were excluded, to which the defendant excepted.

The court in the charge pointed out to the jury certain portions of the publication in question as libelous, and certain other portions of it the court told the jury were not libelous, and in the course of the charge on this subject, the court alluded to that part of the publication relative to the plaintiff's conduct on the subject of the school, in which it is charged that " this false minister, regardless of truth and decency, turned his back traitorously on his own town and his own church in that town, and traveled over the county inventing and publishing the gravest slanders against that church, and against the business and character of the town where he had resided for twenty years ; like Judas Iscariot, he no doubt received his thirty pieces of silver therefor," etc., and told the jury that it was clearly a libel, *if published in the sense alleged in the declaration*, explaining to the jury wherein it was so. To the ruling of the court that that was libelous the defendant excepted.

In relation to the words set out in the fourth count, the court told the jury that they did not constitute a libel, and that there could be no recovery by the plaintiff on that count of the declaration.

In relation to the words set forth in the fifth count, the court told the jury that as the words did not charge the plaintiff with any corruption or intentional misconduct in office, but simply with incapacity for the performance of the duties of the office, the words

were not actionable without proof that the plaintiff had sustained special damage by reason of their publication; and there could be no recovery on the fifth count, as there was no proof that the plaintiff had sustained any special damage by reason of the publication of these words.

The jury returned a general verdict for the plaintiff, that is, the verdict did not specify what counts of the declaration it was based on.

After the verdict and before judgment the defendant filed a motion in arrest of judgment for the insufficiency of the declaration. As to this motion, although the declaration, in the opinion of the court, contained defective counts, yet as it contained a good count or counts, one of which (the third count) contains the whole cause of action, except that set forth in the fourth count, for which the court, as above stated, charged the jury the plaintiff could not recover, the court held that the plaintiff was entitled to judgment on the verdict, and overruled the motion in arrest, and rendered judgment for the plaintiff accordingly. To which decision the defendant excepted.

The third count of the declaration was as follows:

" And the said plaintiff further saith that the said defendant further contending and intending as aforesaid, heretofore, to wit: On the day and year last aforesaid, at Montpelier aforesaid, falsely, wickedly, and maliciously did compose and publish in a certain newspaper called the ' Argus and Patriot,' printed and published by the defendant at Montpelier, in the county of Washington, on the 25th day of July, A. D. 1867, aforesaid, a certain other false, scandalous, malicious, and defamatory libel of and concerning the said plaintiff, and of and concerning the plaintiff in his business, profession and calling as a minister of the gospel, and of and concerning the plaintiff in his business and office as assistant assessor of the internal revenue, in the county of Washington, under the laws of the United States, and of and concerning the plaintiff as president of the Vermont Agricultural Society, aforesaid, containing among other things the false, scandalous, malicious, defamatory, and libelous matter following of and concerning the plaintiff, and of and concerning the plaintiff in his said calling, profession, and business as a minister of the gospel, and of and concerning his business and office of assistant assessor of the internal revenue aforesaid, and of and concerning the plaintiff in his business and

office of president of the Vermont Agricultural Society, that is to say, ' A Jack at all trades' (meaning the plaintiff) 'exposed. A certain would-be prominent individual,' (meaning the plaintiff) 'living in this county,' (meaning the county of Washington aforesaid) 'who holds the office of assistant assessor,' (meaning the plaintiff, who then held the office of assistant assessor as aforesaid) ' and who has acted in almost every capacity within the last twenty years, from a professed minister of the gospel, to swindling his fellow-men out of their honest dues by thousands,' (meaning that the plaintiff, who now is and has for more than twenty years last past been a minister of the gospel, had been, while thus preaching the gospel, fraudulently swindling his fellow-men and citizens of the United States out of their honest dues by thousands of dollars,) ' deserves to have some features of his' (meaning the plaintiff's) ' dark and hypocritical character portrayed to the public as they really are,' (meaning that the plaintiff had been guilty of many vile, immoral, dark, and hypocritical acts as a citizen, and as a minister of the gospel, that deserved and ought to be exposed to the public, to protect the community against the acts of the plaintiff). ' His form,' (meaning the form and person of the plaintiff) 'which is of the Newfoundland dog type,' (meaning that the plaintiff's form resembled the form of a species of dogs known to the citizens of this state by the name of the Newfoundland dog, and the defendant, by the said comparison, then and there intended to bring the plaintiff into ridicule, contempt, and disgrace,) ' with a sonorous voice conceals from the public gaze somewhat as empty a head and as false a heart as can be found in a lifetime, even in this corrupt generation of radical politicians and wolves in sheep's clothing, who profess to be ministers of Christ,' (meaning that the plaintiff as a minister of the gospel was false-hearted and corrupt, and wholly unworthy to be a minister of the gospel, or to associate or have fellowship with any christian denomination) ' this pseudo minister, radical politician, and federal tax-eater' (meaning the plaintiff) ' has this year been chosen president of the Vermont Agricultural Society, a position he' (meaning the plaintiff) ' must have crawled into by hypocrisy and deceit, for the society surely would not have so disgraced the state had they known what they were doing,' (meaning that the plaintiff was a vile, immoral person, and of such a character that it was a disgrace to the state to elect the plaintiff to the office of president of the Vermont Agricultural Society, and that the society would never have so disgraced the state if they had known the true character of the plaintiff, and been informed of the base, hypocritical, and swindling acts of the plaintiff set forth in said libel).

26

'During the war he' (meaning the plaintiff) 'was a blatant and excessively loyal man, who favored hanging his' (meaning the plaintiff's) 'neighbors for their political opinions, and once incited a drunken crowd to mob men in his' (meaning the plaintiff's) 'own town, because they dared to hold a democratic convention,' (meaning that on one occasion at said Northfield the plaintiff did excite a drunken crowd to mob men in the town of Northfield, because they had assembled to hold a democratic convention in said Northfield, and that by reason of the acts of the plaintiff in inciting a drunken crowd as aforesaid, a drunken crowd did mob men in the town of Northfield for attending a democratic convention). 'When the school fever raged in this county last year, and nearly every man in his town' (meaning the town of Northfield) 'was subscribing more than he was able to pay that there might be a first class school there, this false minister,' (meaning the plaintiff) 'wholly regardless of truth and decency, turned his back traitorously on his' (meaning the plaintiff's) 'own town, and his' (meaning the plaintiff's) 'own church in that town, and traveled over the county inventing and publishing the grossest slanders against that church, and against the business and character of the town where he had resided for twenty years,' (meaning that the plaintiff, a short time ago, when the town of Northfield was trying to get a school located at Northfield, traveled through the towns adjoining Northfield, and in different parts of the state, and invented and published false, wicked, and malicious slanders and lies against the members of the Universalist church of the town of Northfield, and against the business men of the town of Northfield, where the plaintiff had resided for more than twenty years, and that the plaintiff had been and was a false minister, a liar, and a slanderer). 'Like Judas Iscariot he' (meaning the plaintiff) 'no doubt received his thirty pieces of silver therefor, but unlike him' (meaning Judas Iscariot) 'he' (meaning the plaintiff) 'lacked the sensibility to go and hang himself afterwards,' (meaning that the plaintiff had been and was paid by some person or persons money for inventing and publishing the vile slanders above imputed to the plaintiff, and that the plaintiff was a vile slanderer and liar, and had lied and slandered the people of Northfield, and had been hired and paid for thus slandering his own church, and the business and character of the town of Northfield, and that he was a traitor to the interests of his own church and own town, where he had resided for twenty years.) 'His' (meaning the plaintiff's) 'blundering and entire incapacity to properly fill the office of assessor' (meaning the office of assistant assessor of internal revenue in the State of Vermont, under the laws of the United States) 'if unknown to any

can be found out fully by inquiring at the collector's office in this district' (meaning the office of the Honorable Joseph Poland, collector of the internal revenue in Montpelier, Vermont, and thereby then and there meaning that the plaintiff was wholly incompetent to perform the office of assistant assessor of the internal revenue in the State of Vermont, and that any one doubting the fact if they would inquire at the office of the said Joseph Poland, the collector aforesaid, in Montpelier, aforesaid, they would ascertain that the plaintiff was wholly incompetent and unfit to perform and fill the office of assistant assessor of the internal revenue, as aforesaid). 'A leading temperance ramrod, when the tide is up, he is ever anxious to take applications for license for the unlawful sale of liquors,' (meaning licenses as assistant assessor, as aforesaid,) 'and then use these same applications in court as proof of violations of the law, shamefully putting his face forward for that purpose, without solicitation from the state,' (meaning that the plaintiff volunteered to prosecute persons violating the laws of the state by selling liquor, without solicitation from the officers of the state.) 'But it is in the capacity of fancy agriculturist, and raiser and exporter of blooded horses, cattle, and sheep that this preacher's character' (meaning the plaintiff's) 'and talents have attained their full development. We' (meaning the defendant, the publisher of said libel) 'will not take time now to trace his' (meaning the plaintiff's) 'serpentine course in finances when following this calling, nor tell how he' (meaning the plaintiff) 'spent all his own money, and everybody's else he could get his' (meaning the plaintiff's) 'hands on in the business, but design simply to show the farmers in this state generally, and the Vermont Agricultural Society in particular, the *genius* of the man' (meaning the plaintiff) 'who stands at their head,' (meaning who is president of their society.) 'Not many years ago he' (meaning the plaintiff) 'was engaged in preparing and sending to Ohio, and other western states, blooded Merino sheep and lambs, and did it quite extensively, receiving for a time large profits. The process, as we' (meaning the defendant, the writer of the libel aforesaid) 'learn it from *several reliable citizens who were fully cognizant of the transactions*, was to purchase common sheep and lambs (not blooded) at the usual small prices, and then display his' (meaning the plaintiff's) 'genius and ingenuity in making them *counterfeit* full-blooded Merino sheep, disposing of them as such in the West at greatly enhanced prices, often selling single ones for ten times the first cost or worth of them, and selling whole lots at five times their real value. By means of singeing and curling the short wool with lighted paper, and then coloring it thoroughly with lamp-black and some other

ingredients, known only to the initiated, a reddish cast was given to the sheep, almost exactly like the genuine Merino, and they were exported and sold as such by the reverend gentlemen' (meaning the plaintiff) ' as a legitimate business. When asked by honest men, cognizant of the process, what he ' (meaning the plaintiff) ' should say when he ' (meaning the plaintiff) ' met the swindled purchasers' (meaning the persons to whom the plaintiff had sold the counterfeit Merino sheep so sold them, as aforesaid,) ' the next year after the Merino had faded out and evaporated, he ' (meaning the plaintiff) ' in some cases replied that he' (meaning the plaintiff) ' should tell them ' (meaning the purchasers of the counterfeit Merino sheep aforesaid) ' it was caused by the change of climate, and in others that the West was a large country and that there would be other places to sell next year.' (Thereby then and there meaning that the plaintiff had bought common sheep, not blooded, and by singeing the wool and coloring it, had sold said sheep for full-blooded Merino sheep, at five to ten times their value, in Ohio and other places in the West, and had knowingly and fraudulently by selling common sheep for full-blooded Merino sheep swindled the citizens of Ohio and other western states, out of large sums of money, and thereby then and there meaning that the plaintiff was a cheat and a swindler.) ' As is usual in such cases the business did not prosper' (meaning the business of buying common sheep, and by fire and lamp-black and other ingredients, converting them into counterfeit full-bloooded Merino sheep and selling them in the west did not prosper) ' and the genius of it ' (meaning the plaintiff) ' became poor, resumed preaching again, assisted in making ramrod raids, eating taxes and abusing his neighbors, all of which he ' (meaning the plaintiff) ' continues to do to the present time. How is it possible for such a being' (meaning the plaintiff) " to preach and associate with honest men, much more how it came about that the Vermont Agricultural Society should make such a being' (meaning the plaintiff) ' their president, are questions to which the neighbors and townsmen of said individual' (meaning the plaintiff) ' find no answer except a look of blank astonishment.' (Thereby then and there meaning the plaintiff was a vile cheat and a swindler as a citizen, and a corrupt, immoral, false-hearted, and unworthy minister of the gospel, wholly unworthy to preach or associate with any christian denomination, and unfit to associate with honest men, and was wholly incompetent as an assistant assessor of the internal revenue, and a disgrace as president to the Vermont Agricultural Society, and a disgrace to the State of Vermont.)"

The defendant's notice alleged matters in justification, tending to show the truth of the publication in question. The notice was of great length, but the only portions material to be stated in this connection were the following :

"That within the last twenty years, and prior to the publishing of said supposed libel, as set forth in the plaintiff's declaration in this case, to wit : at Warren, in the County of Washington, to wit, on the 15th day of September, A. D. 1862, the said Gregory did apply to one Franklin A. Wright, a citizen of said Warren, to purchase of said Wright two valuable horses, of the value of one thousand dollars, and did then and there represent to said Wright that he would pay for said horses one thousand dollars, that he would give Wright his promissory note for the same, would take said horses into the western states, and immediately sell them and pay said Wright therefor as soon as the horses were sold, and said Gregory did then and there write and sign a note for the sum of one thousand dollars for said horses, ' payable when said horses were sold,' and the said Wright, relying on the said Gregory's statements and representations aforesaid, that said horses were to be immediately sold, received said note in payment for said horses. And this defendant avers that said Gregory, at the time he received said horses and made such representations, and delivered said note, did not intend or purpose to pay said Wright for said horses, but fraudently to cheat and defraud said Wright out of said horses, and the pay for the same. And the said Gregory now claims and avers to said Wright that said horses are not sold, and that said note is not due, and refuses to pay said note, or any part thereof, and he has not paid anything for said horses, and said Gregory has disposed of said horses in some manner otherwise than by a technical sale, and thereby evades the payment of said note, or for said horses, and defies said Wright, and refuses to compensate said Wright for said horses, and so the said Gregory has cheated and defrauded and swindled the said Wright of his property and the value thereof."

The defendant further gave notice, in detail, of a former marriage of the plaintiff, in Albany, N. Y., on the 26th day of February, 1828, with one Ellen Banton, and that he lived with her as his wife for about eight years, and then, while said Ellen still lived, and without ever having obtained a divorce from her, mar-

ried one Mary Averill, April 1st, 1840, and has ever since lived and cohabited with her.

There was no question but that the inducement and prefatory averments of the first count were sufficient.

The following is the deposition of F. A. Wright:

"Mr. John Gregory, of Northfield, bought two stud horses of me some seven or eight years ago for the price of one thousand dollars, for which said Gregory gave me his note, a pretended copy of which is hereby presented, which I think is correct, and reads as follows, viz.:

"'For value received I promise to pay Franklin A. Wright, or order, one thousand dollars on demand, with interest.

"'(Signed)                    JOHN GREGORY.

"'Northfield, December 18, 1860.

"'The above note is given for two horses, formerly owned by Mr. Green, of Warren, with the understanding that said note is to be paid when I sell them and get my pay for them.

"'(Signed)                    JOHN GREGORY.'

"I never have received a cent of pay on the above note for said horses. The horses were delivered one before and the other at the time of the date of the above note. I have had several conversations with said Gregory in regard to the payment of the above note; he has never refused to pay, but has always said he would pay when he (Gregory) got his pay for the horses. Said Gregory told me, or I got the impression from his conversation, that he had lost one of said horses, and thought it doubtful whether he should ever recover the horse, or find the man. Mr. Gregory, in conversation with me, told me that he could sell one of the horses, and has since told me he sold said horse for the price of $225; since then he told me that there was some interest or something to be added to that so as to make the sum $234. The above is all that said Gregory has ever offered to pay, and said it was all he could pay, unless he (Gregory) got something from the other horse.

"*Cross-examination.*—Mr. Gregory has at different times shown me letters, purporting to be from different individuals, in relation to the sale of said horses.

"Question.—From the letters Mr. Gregory has shown you, and from the conversations you have had with him relative to the above horses, do you think he has acted in good faith relative to the payment of said note and to the sale of said-horses?

"Answer.—I can't say but that he has.

"The above question and answer objected to by counsel for the defendant."

Gregory v. Atkins.

*J. A. Wing, Heman Carpenter* and *Paul Dillingham* cited, in support of the ruling of the county court, that certain portions of the publication were libelous, *Matthews* v. *Beach*, 5 Sandf., 256 ; *Colby* v. *Reynolds*, 6 Vt., 489 ; *Nott* v. *Stoddard*, 38 Vt., 25 ; *White* v. *Nichols et al.*, 3 How., (N. Y.), 266 ; *Cooper* v. *Greeley et al.*, 1 Denio, 347 ; *Riggs* v. *Denniston*, 3 Johns. Cases, 198 ; *Morse* v. *Bennett*, 48 Barb., 229 ; *Steel* v. *Southwick*, 9 John., 213.

*Randall & Durant*, and *Redfield & Gleason*, for the defendant.

The first exception should be sustained. The plea alleges the Wright transaction, etc. Was it competent to prove a sale, as alleged ? The objection was not to a specific part of the deposition, but to the whole ; therefore, if any part was admissible, it ( that part) should have been received. 16 Vt., 162. The proof of a marriage and cohabitation with a second wife should have been admitted. 1 Green. Ev., § 456, and cases cited, etc.

The next exception is " clearly " right. The court is to define a libel, and the jury to say whether the words come within the rule or not. Such was not the course in the court below. But they were told that such parts were " *clearly a libel*," and an explanation was given why. *Van Vetchen* v. *Hopkins*, 1 Am. Lead. Cas., 126 ; 4 Gray, 546 ; 26 Wend., 383 ; 11 Met., 551 ; 11 Ad. & Ellis, 920 ; 32 Vt., 55 ; 6 Mees. & Wels., 105 ; 12 Johnson, 238, and cases cited ; *Dolloway* v. *Turrill*, 26 Wend., 383. Were the words libelous, *per se?* We say not. 1 Am. Lead. Cases, 113, 114, and cases cited. That this court might declare whether the jury found it or the words libelous on sufficient grounds, there is no doubt. Our complaint is that the county court took this right from the jury. It virtually directed, and this before the finding of the jury.

The motion in arrest should prevail. A motion in arrest covers the same ground as a general demurrer. The third count has no colloquium for most of the words spoken, as the inuendoes assert they were spoken. 1 Aik., 33 ; 1 D. Chip. 278 ; Cowper, 672, (336 and 338). 1 Am. Lead. Cases, 125–126, 132, 138, 43, 4. The count is otherwise defective, 26 Wend., 398.

The opinion of the court was delivered by

PROUT, J. This is an action on the case for an alleged libel, in which it is insisted by the defendant that the county court made several erroneous decisions, and to which exceptions were taken. The case was tried upon the general issue and notice of special matters of defense.

*First*, as to the admissibility of the deposition of F. A. Wright, which was offered as supporting the issue under the notice and excluded. Matter of justification, to be of any avail or admissible in evidence, must meet and answer substantially, if not exactly, the substance of the libel declared upon. It must answer it in the sense of the prefatory averments and inuendoes of the declaration. When the publication contains a direct and specific libelous charge, matter justifying it, as that the truth of the charge will be relied upon and proved, limits and confines the party to proof, upon every principle of pleading, to that very issue, and he cannot go outside or beyond it. Otherwise, there is involved the absurdity of allowing proof of the truth of another and different charge, which is never admissible. In the present case, that portion of the libelous article, which it is claimed the deposition tends to justify, is a charge of swindling, and the notice in justification sets forth a transaction with the witness which, if proved, justifies it. The allegation of the notice is that, at the time, etc., the plaintiff fraudulently intended to cheat, and in respect to the trade he then entered into, and to which the deposition relates. This allegation of intent is material, and is an allegation of matter of fact, which constitutes the very essence of the offense, and the pleader seems to have so regarded it. Now, the deposition falls far short of showing *that* fact. Indeed the witness swears that he cannot say but that the plaintiff acted in good faith, and with an honest intent. Non-payment of the claim, it is true, is a fact or circumstance aiding in the proof of the issue to a certain degree, but it is only a step, a single link in the chain of evidence necessary to make out the fact, and of itself does not prove the issue. The court were, therefore, correct in excluding it, the defendant not offering any evidence in aid of it.

*Second.* These views have an application, somewhat, to the exception to the decision excluding evidence to prove the plaintiff's

marriage to Ellen Banton.   That transaction, if real, is not within
the scope and meaning of the libel, which, neither in terms or in-
ference, refers to it.   The publication consists of specific charges
of acts and conduct, and a justification of acts outside of it does
not answer or meet the gravamen or gist of the plaintiff's com-
plaint.   Then again, the plaintiff did not claim to recover under
so broad a construction of the libel as the evidence offered im-
plies, but only for charges of particular acts of misconduct, or
acts of misconduct of the character charged in the publication.
There was no error in excluding this testimony.

*Third.*   The charge, it is insisted, was erroneous, and that the
court encroached upon the province of the jury.   A portion of the
article, which is quoted in the exceptions, the court told the jury
was libelous if published in the sense alleged, leaving, of course,
the meaning to be ascertained by the jury.   There being no con-
troversy as to the fact of publication, was the court justified in
saying that the article, wherein the plaintiff is charged with being
a false minister, regardless of truth and decency, with traitor-
ously turning his back upon his own church, and with inventing
and publishing the gravest slanders against that church, etc., was
libelous, qualified, as it was, in respect to its sense and meaning ?
The plaintiff was a regularly ordained minister of the gospel, and
in regular standing in his denomination, and this language seriously
touched him in that capacity and relation.   It needs no authority
to show that imputations of this character are libelous.   But it is
claimed, and strenuously, that the exception is clearly right, as
that question was for the jury, and *Dickey* v. *Andros*, 32 Vt., 55,
is cited as sustaining the position.   That action was *case* for
slander.   The language or words " were equivocal, not necessa-
rily or naturally implying " the offense claimed to have been
charged.   Upon the evidence the court directed a verdict for the
defendant, and on exceptions that judgment was affirmed, which
the court would have hardly done if the question whether slander
or not was wholly for the jury.   This is all there is of that case,
and inferentially it seems to sustain the view of the county court
in this case.   But however that may.be, where there is no ambi-
guity in the language, as in a case where there is an unequivocal

27

Gregory *v.* Atkins.

charge, accusing one of an infamous crime, or of conduct calculated to bring him into disgrace, which is injurious and affects him in his situation and station, whether it is libelous or not would seem to be a question of law, or "the judgment of law on facts and intent." If it is not, the case goes to the jury unfettered by any legal rule or guide. Generally they are judges only of the facts, and the action of case for libel is no exception to the rule, which, in respect to civil actions, is universal. Their province, in an action of this character, is to find whether or not the publication was made by the defendant, whether it was with intent to injure the plaintiff, or whether it was malicious and false, as well as to find that its sense and meaning is as set forth in the declaration. These are all elements and matters of fact which enter into and constitute the article libelous; but with these facts ascertained, the legal quality of the article is for the court, and as much so as the language of a written contract, which is always, when unambiguous, a matter of legal construction. If some of the cases mean more than that the question, whether a libel or not, is for the court, and the sense and meaning for the jury, we regard them, upon the facts of this case, as unsound. STARKIE, 327, treating of the criminal division of this subject, says "the quality of the alleged libel, as it stands on the record, either simply, or as explained by averments and innuendoes, is plainly a question of law for the consideration of the court," and that this "position rests not only on precedent, but legal analogies, and on obvious grounds of reason and experience." In alluding to the question as arising upon demurrer or writ of error, he remarks that it is plainly one of law, and it must be decided by the court as such. The question, as all are aware, may be raised after verdict, on motion in arrest, and independent of the finding of the jury. This is wholly inconsistent with the defendant's theory and claim, that the question is exclusively for the jury. When the language is ambiguous, or susceptible of a double meaning—one innocent and harmless, the other libelous and injurious—the sense is always for the jury to find, as well as to find and say whether the innuendoes of the declaration, explanatory of the meaning, are justified by the words; and it is in this view that the question, whether a libel or not, is for the jury.

Gregory *v.* Atkins.

In *Dalloway* v. *Turrill*, 26 Wend., 382, relied upon as supporting the defendant's view of the law, the question arose upon a charge that the only question for the jury to consider was whether the defendant had been proved guilty of publishing the libel. This instruction was held erroneous, as the jury was not allowed to pass upon the sense, intent and tendency of the publication. In the present case, the court submitted the question upon that rule, in effect saying to the jury that that part of the article in question is libelous, provided they found it was published by the defendant in the sense alleged in the declaration. This rule is recognized in the case in Wend., where it is remarked that "the intent must be collected from the words used. Where they have a certain definite meaning, the jury cannot rightfully indulge in conjectures not warranted by the legal import of the words ; but if it is doubtful whether the words impute crime, or may be satisfied by ascribing to them a meaning which renders them not actionable, then the intent is a fair subject before the jury ;" or " whenever the words are capable of more than one construction, it is the province of the jury to determine in what sense they are meant." This was the rule of the county court, and we think it the correct one. 1 Am. L. Cas., 132–137. *Woodworth* v. *Meadows*, 5 East, 463 ; *Roberts* v. *Camden*, 9 Id., 93 ; *Carter* v. *Andrews*, 16 Pick., 1 ; *Graves* v. *Waller*, 19 Conn., 90 ; Townsend on Slander and Libel, § 284.

*Fourth*, as to the motion in arrest. The declaration consists of six counts, all declaring upon the same, or portions of the same libelous article, but the court told the jury that the plaintiff was not entitled to recover on the fourth and fifth counts, thus throwing those counts out of the case. The third count we think sufficient, as it refers to the inducements and prefatory averments of the first count, and the innuendoes are not inconsistent with them or the language of the libel. Act of 1865, No. 12. 1 Am. L. Cases, 145. The other counts we have not examined critically, and as we should, had it been pointed out wherein it is claimed they are faulty. The motion is overruled.

The exception to the charge in relation to the transaction with Herrick was not insisted upon. The judgment is affirmed.