## Alexander Prussing v. Lewis B. Jackson.

1.  LIBEL—*Statutory Definition.*—A libel is a malicious defamation expressed either by printing, as by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation; or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule or financial injury.

2.  SAME—*Actionable Publications.*—A newspaper article which expressly charges a conspiracy of all the crushed stone dealers and cement manufacturers to bribe a sufficient number of the members of the city council, to secure the passage of an ordinance, which, if acted under, would be a fraud on the municipality and jeopardize the health of the entire city, and characterizes the passage of such ordinance as a crime to which the slaughter of the innocents will seem as mild as mother's milk, and then charges the city engineer with being one of the conspirators by saying that the ordinance will be recommended by him, and that he will be taken care of liberally, is actionable *per se*, and a jury will be warranted in assessing not only actual but exemplary damages.

3.  SAME—*Publications—Writer of Libelous Articles.*—Where a person furnishes a libelous article to a newspaper for the purpose of having it published, and it is so published, it is, in legal contemplation, a publication by the person furnishing the article.

4. CONSTRUCTION OF STATUTES—*Act in Relation to Libel.*—The act of the general assembly in relation to libel, approved June 24, 1895, (Laws of 1895, 315,) applies only to the publishers of newspapers.

Action in Case, for libel. Trial in the Circuit Court of Cook County; the Hon. GEORGE W. BROWN, Judge, presiding. Verdict and judgment for plaintiff. Heard in this court at the March term, 1899. Affirmed on condition of a remittitur. Opinion filed November 2, 1899.

ERNEST SAUNDERS and WILLIAM G. ERNST, attorneys for plaintiff in error.

A publication is libelous *per se* when language is used concerning a person or his affairs, which from its nature necessarily must or presumably will, as its natural and proximate consequence, occasion him pecuniary loss. Newell, L. & S., 181.

The right to comment upon the public acts of public men is the right of every citizen, and is not the peculiar privilege of the press. Kane v. Mulvaney, W. R., 2 C. L. 402; Odgers, Libel, *35.

The rule is that every defamatory publication implies malice, but privileged communications are an exception, and the rule of evidence as to such communications is so far changed as to require of a party to bring home to the alleged defamer the existence of malice as the true motive of his conduct. Newell, L. & S., 391.

A communication by a person immediately concerned in interest in the subject-matter to which it relates, for the purpose of protecting his own interest, in the full belief that the communication is true and without any malicious motive, is held to be excused from responsibility for a libel. Newell, L. & S. 510; Brown v. Hathway, 95 Mass. 239.

COLLINS & FLETCHER, attorneys for defendant in error.

A libel is to be construed as the world generally would understand it. More v. Bennett, 48 N. Y. 272; Barnes v. Hamon, 71 Ill. 609; Folkard's Starkie on Slander and Libel, Sec. 155; Morgan v. Halberstadt, 60 Fed. 595; Newell on Slander and Libel (2d Ed.), 302.

A libel should be considered as a whole, and not in de-

tached parts. State v. Bush, 122 Ind. 42, 23 N. E. Rep. 677; Morgan v. Halberstadt, 60 Fed. Rep. 595.

A libel is a malicious defamation, expressed either by printing or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation of one who is alive, and thereby to expose him to public hatred, contempt, ridicule or injury. S. & C. Ann. Ill. Stat., Ch. 38, par. 321; Hodkins v. Tanner, 27 Chic. Leg. News, 180; Jacksonville Journal Co. v. Beymer, 42 Ill. App. 443.

Definitions and nature of a libel, and illustrations thereof. · Pfitzinger v. Dubs, 64 Fed. 696; Cerveney v. News Co., 139 Ill. 345; Dexter v. Spear, 4 Mason (U. S.) 115; White v. Nichols, 3 How. (U. S.) 266; Cooper v. Greeley, 1 Denio (N. Y.) 363; Bradley v. Cramer, 59 Wis. 311; Colby v. Reynolds, 6 Vt. 494; Mitchell v. Bradstreet Co. (Mo.), 22 S. W. Rep. 558.

Plaintiff in error, in stating that words spoken, to be actionable, must impute a crime, is guilty of an inaccuracy. Such is not the law. Townshend on Slander and Libel (4th Ed.), Sec. 153, 158; Newell on Libel and Slander (2d Ed.), 84, 198, 199, 200.

The claim that written words of an official, to be libelous *per se*, must warrant removal from office, is unfounded. Townshend on Slander and Libel, (4th Ed.); Secs. 196, 197; Folkard's Starkie on Slander and Libel, Sec. 187; Odgers on Libel and Slander (Bigelow's Ed. 1881), 27; Newell on Slander and Libel (2d Ed.), 176.

MR. JUSTICE ADAMS delivered the opinion of the court.

This suit is brought to reverse a judgment rendered in favor of defendant in error against plaintiff in error for the sum of $20,000. The action was case, for libel. The alleged libel is as follows:

" DEAR SIR: About two months ago the Chicago Brick Manufacturers' Association was informed by several of its members that a combination of all the crushed stone dealers, and all of the cement manufacturers of the city, had been formed for the purpose of obtaining the passage of an

ordinance providing for the sole use of concrete, made from crushed stone and cement, in the building of Chicago sewers.    The matter has been carried on in the utmost secrecy, but the brick manufacturers, whose business would be greatly affected by the passage of such an ordinance, have quietly secured sufficient information to convince them that another gigantic steal is contemplated, that money is said to be in escrow to an amount of nearly $100,000 to secure the votes necessary in the council, and that the ordinance will be recommended for passage by Engineer Jackson, who, it is said, will be taken care of liberally.

" Aside from the fact that this will be another sale by the aldermen, to which we are accustoming ourselves, the absolute worthless character of such an improvement as a concrete sewer should, of itself, be a bar to the consideration of such an ordinance by honest members of the council.    It is well known, from experience with concrete sewers, that the gases arising from the chemical constituents of sewage tend quickly to disintegrate the material, and therefore, sooner or later, to bring about a collapse.    There is no question in my mind that men of such large experience as Mr. Claussen, of the Department of Sewers, look with dismay upon the future, because of the enormous contracts to be let this year for both sewer and tunnel work, which, if carried out under the provisions of the ordinance now being drawn. will, within a very few years, jeopardize the health of the entire city.    Of course, this cuts no figure with our aldermen so long as there is ' something in it ' for them, and unless a firm stand is taken by the reputable men in the council this ordinance will be railroaded through next Monday, that being the intention of the promoters.

" The brick manufacturers, although alive to the situation, are also well aware that the methods employed by the promotors of this enterprise are the only ones which carry weight with the men who are a majority in the council, and they have declined to become parties to any deal to prevent the passage of this ordinance.    D. V. Purington, president of Brick Manufacturers' Association. and *ex-officio* chairman of the committee having this matter in charge, can probably give you more information.  Personally, I believe that all the boodle ordinances heretofore passed may be considered creditable and philanthropic legislation in comparison with the passage of such an ordinance, which will be a crime to which the slaughter of the innocents will seem as mild as mother's milk.    Once let the decay of

concrete sewer walls begin and the consequences of defective drains will soon be felt, especially should this take place in winter, when epidemics, caused by imperfect sanitation, are prevalent. Murder by violence would be a cardinal virtue."

The foregoing matter was published in the Times-Herald, a newspaper printed and published in the city of Chicago, July 12, 1896, and 100,000 copies of the paper containing the article were issued by the publishers at that date. Lewis B. Jackson, defendant in error, was appointed city engineer of the city of Chicago July 6, 1895, and entered upon his duties as such engineer July 16, 1895, and was such engineer during the month of July, 1896. He entered upon his professional career as a civil engineer in 1869, and between that year and 1895, when he was appointed city engineer of Chicago, had been employed in responsible positions by a number of railroad companies. It appears from the evidence that the duties of a civil engineer are investigating projects, making approximate estimates of the cost of work, preparing specifications and plans for the work, supervising it while in progress to see that it is done in accordance with the plans and specifications, and certifying vouchers for work done. Defendant in error testified that since he had been a civil engineer he had certified vouchers to an amount between ten and eleven millions of dollars. An ordinance of the city of Chicago, introduced in evidence, provides, among other things, as follows:

" The City Engineer shall perform such duties as may be required of him by the Commissioner of Public Works or the ordinances of the city.

" He shall perform all such services in the prosecution of public improvements as may require the skill and experience of a civil engineer."

Plaintiff in error, called as a witness for defendant in error, on being shown the article as printed and published in the Times-Herald, testified that he first saw it as printed and published March 12, 1896. On being asked the question, " Do you know who composed it?" he answered, " Yes, sir; I did." On cross-examination by his attorney

he was asked, " Mr. Prussing, you say you wrote this article; what caused you to write this article?" to which question he answered, "Well, I can't say that I wrote *this* article, but one similar to it was written in long-hand by myself." Plaintiff in error, in his examination in chief, testified that he knew Edmund Varian, a reporter; that he met him March 11, 1896, at witness' office, but did not know how he happened to come there; that he did not send for him or for any one from the Times-Herald office; that he presumed he came through the Times-Herald people. In his cross-examination by his attorney he gave this account of the matter:

" Varian came into my office; stated that he was sent by Times-Herald to know if I had any. information regarding deal in cement or crushed stone which was understood was to be brought before council following Monday night; told him I had no information except what had been given me second-hand, to which he was welcome, as I was about to write a letter to your aldermanic friends and tell them what I knew about it; told him at the time I was surprised that newspaper boys didn't know anything about it, because it was common rumor among building men that a scheme of that kind was on foot; he stated that the papers were not aware of it, and asked if he could see copy of the letter I was going to send aldermen, I had reference to. I said, ' Certainly you may,' and let him have it. When through reading it, he said, ' Is this all you know about it?' I said, ' I don't know anything at all about it except what has been stated here as rumor or hearsay.' He said, ' May I take this article with me?' I said, ' Most assuredly you may.' He took it. Next time I saw anything similar to what I had written was in next day's paper."

On being asked what, if anything, he said to Varian in relation to the publication of the article, he answered, " I said nothing."

Herman L. Reiwitch testified that he was city editor of the Times-Herald July 11 and 12, 1896. On being shown the article as printed and published, he was asked, " When did you first see anything like that, or similar to that?" and answered, "The afternoon preceding its publication."

He further testified that it was brought to him by Varian, the reporter, and was printed as brought in.

Counsel for plaintiff in error contend that the article is not libelous *per se.* Our statute thus defines libel:

" A libel is a malicious defamation, expressed either by printing, as by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or financial injury." 1 S. & C.'s Stat. (2d Ed.), 1321, par. 321.

Counsel for plaintiff in error contend that the article is not libelous *per se,* because it merely charges an intent on the part of the defendant in error to do wrong in the future, and because it does not impute a crime. The language is, " The brick makers * * * have quietly secured sufficient information to convince them, etc., * * * and that the ordinance will be recommended for passage by Engineer Jackson, who, it is said, will be taken care of liberally." No name of any person who said that Jackson would recommend the passage of the ordinance, or of any person who said he would be taken care of liberally, is given. The statement, therefore, must be assumed to have been made on the personal responsibility of the writer of the article.

Smith v. Stewart, 5 Pa. St. 372, was an action for oral slander. The words charged were, " That man was in the penitentiary of Ohio and I can prove it." Evidence was introduced by the defendant that he said " If reports be true," etc. It was contended that if the words charged in the indictment were preceded by the words " If reports be true " there was a fatal variance, but the court overruled the contention, saying:

" In the language of Lord Kenyon (Davis v. Lewis, 7 Term R. 19), ' the plaintiff can only impute the slander to him who utters it, if the latter does not mention the name of the person from whom he heard it.' If it were otherwise, one individual might ruin the loftiest reputation and torture the purest heart in the country, by secretly circulating, giving the embodiment of the report (such as it is)

to some vile slander, and then setting up the very slander itself as a defense to an action for uttering and publishing it. *If reports be true.* This language designates no individual, lights upon no one, describes nobody, and is, in fact, nothing but the mere ideal of responsibility which the wicked conjure up to shelter them, whilst they inflict a wound."

The court further say :

" The words assumed in defendant's point are substantially and legally of the same effect as those laid in the *narr.*"

Booker v. The State, 14 So. Rep. 561 (Ala.), was indictment for oral slander. The words charged were :

" That Bryant Mancill had hired witnesses in the justice of the peace court to swear to lies."

The testimony was that Booker, speaking of the trial, said:

" He was satisfied that he (Mancill) had hired witnesses to swear lies against him."

Held, there was no variance. The court, after citing a number of cases, say :

" The principle of these cases is, that the utterance of slanderous words on belief, or on information or report, unless the name of the informant be furnished as part of the utterance, is the legal equivalent of their positive statement as facts."

In Treat v. Browning, 4 Conn. 408, the court say:

" If a person utter of another, ' She is a prostitute,' or, ' If I am not misinformed, she is a prostitute,' the essential charge in both instances is constructively the same, or this unhappy consequence must inevitably result, that, by a mode of phraseology which indicates that the person speaking had heard the crime imputed, slander might be propagated with impunity. If this were not the legal construction, malice would not desire, nor could it desire, a better shield of protection from suit for the publication of the most wanton calumny." See also Boyce v. Maloney et al., 58 Vt. 437.

In view of the authorities cited and the reason of the matter, the language of the article is equivalent to the

positive statement, "The ordinance will be recommended by Engineer Jackson, who will be liberally taken care of." In determining whether the article in question is libelous *per se*, or actionable without proof of special damage, it is to be borne in mind that words which, if merely spoken, are not actionable, may be actionable if printed and published. Odgers on Libel and Slander (by Bigelow), 1st Am. Ed., Secs. 3, 4; also, that the whole article must be consid- ᾽ ered, and the language used understood in accordance with its ordinarily accepted meaning. Ib., Sec. 3; Nelson v. Borchenius, 52 Ill. 236; Barnes v. Hamon, 71 Ib. 609; Ransom v. McCurley, 140 Ib. 626.

The article first states that "A combination of all the crushed stone dealers and cement manufacturers of the city has been formed for the purpose of obtaining the passage · of an ordinance providing for the sole use of concrete, made from crushed stone and cement, in the building of Chicago sewers." It then states that "another gigantic steal is contemplated;" that money to an amount of nearly $100,000 is in escrow to secure the necessary votes in the council, and that the ordinance will be recommended by Engineer Jackson, who will be liberally taken care of. It further states:

"Aside from the fact that this will be another sale by the aldermen, to which we are accustoming ourselves, the absolutely worthless character of such an improvement as a concrete sewer should, of itself, be a bar to the consideration of such an ordinance by honest members of the council," etc.

The article expressly charges a conspiracy of all the crushed stone dealers and cement manufacturers to bribe a sufficient number of the members of the city council, the aldermen, to secure the passage of an ordinance which, if acted under, would be a fraud on the municipality and jeopardize the health of the entire city. The passage of such an ordinance is characterized as "a crime to which the slaughter of the innocents will seem as mild as mother's milk." The article then charges Engineer Jackson with being one of the conspirators, by saying that the ordinance will be recommended by him, and that he will be taken care

of liberally, which can only mean that he consented, for a pecuniary or other consideration, to act with the other conspirators to effect the object of the conspiracy, namely, the passage of the ordinance.

" A conspiracy may be regarded as a combination of two persons or more, by a concerted action, to accomplish a criminal or unlawful purpose, or a purpose not in itself criminal, by unlawful or criminal means." Heaps v. Dunham et al., 95 Ill. 583; Spies v. The People, 122 Ib. 212.

To bribe a member of the city council, with intent to influence his vote, is a crime (1 S. & C.'s Stat., Ch. 24, par. 80), and to conspire to procure the passage of an ordinance by such bribery is a conspiracy to effect that purpose by criminal means.

To charge one with having consented, for a pecuniary or other consideration, to become the base instrument of such a conspiracy, clearly tends to impeach his honesty, integrity and reputation, and is, therefore, within the very words of the statute defining libel, and is actionable *per se.* The law implies malice from the publication of an article libelous on its face, and in such case no evidence of malice other than the libel itself is necessary to a recovery.    Odgers on L. and S., Sec. 6; Townsend on S. and L., Sec. 399; 3 Greenl. on Ev. (13th Ed.), Sec. 168; Matteen v. Albert, 97 Tenn. 232; Hintz v. Graupner, 138 Ill. 158, 166; and the words being actionable *per se,* a jury will be warranted in assessing not only actual but exemplary damages.    Hintz v. Graupner, *supra.*    The original article delivered by plaintiff in error to the reporter, Varian, July 11, 1896, was not produced on the trial, but a copy of the issue of the Times-Herald of July 12, 1896, containing the article heretofore quoted, was admitted in evidence.    Counsel for plaintiff in error insist that the original should have been produced, and that the Times-Herald containing the article was improperly admitted in evidence.    Defendant in error testified that in the afternoon of July 12, 1896, his attention was called to the article published in the Times-Herald that day by Mr. Kent, the commissioner of public works of the city of Chicago; that Kent read the article, and that during the con-

versation between him and Kent, Prussing came in; that witness asked Prussing what he knew of the article, and he said it was information which had been given him; that, on being asked to name his informant, he declined to do so then, but said he would give the name to defendant in error later; that the article in the Times-Herald was being discussed, when Kent asked Prussing if he knew this.

"He said he didn't know it himself. He says, 'Who is your informant, or where did you get your information?' He says, 'This report, this letter, is exactly what I was informed.'"

The Court: "What letter?" Ans. "The letter that appeared in the article of March 12th, in the Times-Herald. Besides the reportorial remarks, or statements in the paper, there was a letter in small type."

Judge Collins: Q. "Was anything said about how this communication came in the Times-Herald?" A. "Yes, sir."

Q. "What was said?" A. "Mr. Prussing stated that the letter there that appeared was the one that he had given to the reporter. He was asked if he knew me, by Mr. Kent; he said he did not. He was asked if he had ever met me; he said he had not."

The witness was then shown the Times-Herald of March 12, 1896, and his attention was called to the published article, commencing "Dear Sir," when he was asked if that was the statement about which he was talking, to which question he answered, "It is."

On objection made by counsel for Prussing, this occurred :

The Court: "Is this article or statement that was just identified here, in answer to Judge Collins' question, the one that you and Prussing were talking about?" A. "Yes, sir." Q. "Had you read it before that conversation?" A. "Yes, sir, I had, in the office." Q. "Was the article there at the time of the conversation?" A. "The paper was there." Q. "Now state what, if anything, was said about the publication of it, or his connection with it?" A. "He stated, he was asked by Mr. Kent if he knew anything about that report, and then the question was asked afterward whether that was what he gave to the reporter. He said it was. Then, as I remember, Mr. Kent asked him if he knew me. He said he did not know me, nor had ever met me; that the information in that was given him by another party."

Prussing v. Jackson.

Plaintiff in error having failed to produce the original writing, on notice to produce it, the court, on attorneys for defendant in error undertaking to connect the printed and published article in the Times-Herald with plaintiff in error, admitted such printed article in evidence.    Prussing's attorney objected generally and made this specific objection: "I object until it is properly connected." It is now claimed that proper connection was not made.    Reiwitch, the city editor of the Times-Herald, was subsequently called, and having testified, as heretofore stated, that the original letter or article was brought to him by Varian, the reporter, and that it was printed as brought in, testified that he told Varian to keep the letter, his reason for so telling him being that it was of a peculiar character and might be questioned; that Varian had not been connected with the Times-Herald for about one and one-half years; that he did not know where he was; that if the manuscript had been preserved by the Times-Herald, it would most likely be in his (the witness') possession; that it was not in his possession; that there was no particular place in the office of the newspaper where such manuscripts were kept; that the custom was to destroy such manuscripts within a few days after they were used; that, so far as he knew, the manuscript was destroyed, and that it would be absolutely impossible to find it.  Plaintiff in error, called as a witness by defendant in error, testified, as heretofore stated, that he gave the manuscript to Varian, and we think it a reasonable and natural inference from his testimony that he gave it to Varian for publication in the Times-Herald.    He knew that Varian was a reporter for that paper, and also that he had been sent to him by the paper for information. He says in his testimony:

"Mr. Varian came into my office and stated that he had been sent by the Times-Herald to know if I had any information regarding a deal about cement or crushed stone, which it was understood was to be brought before the council; an ordinance was to be brought before the council on the following Monday night."

He also knew that the Times-Herald was a newspaper, and must have known that the information sought was

for publication. Knowing all this, he not only gave the article to the reporter, but gave it to him eagerly, as his testimony indicates, without any request that it should not be published. For what purpose, if not for publication, did he give the manuscript to Varian? Was it merely for Varian's private information, or for the private information of his employers? Varian was seeking information, not for himself, or for any private person, but for the Times-Herald, a public newspaper, which could only use information gathered by its reporters by printing and publishing it. We think the inference irresistible that the manuscript was given by plaintiff in error to Varian for the purpose of having it published in the Times-Herald. This being so, the publication in the Times-Herald was, in legal contemplation, a publication by plaintiff in error. Clay v. The People, 86 Ill. 147; Newell on Defamation, etc., 228, Sec. 2; 243, Sec. 20; Odgers on Libel and Slander (1st Am. Ed.), par. 155; Thomas v. Smith, 75 Hun, 573; Bond v. Douglas, 7 C. & P., star p. 626; Burdett v. Abbott, 5 Dow's Rep. (H. L.), 165, 200, 201.

In Burdett v. Abbott, *supra*, Lord Erskine said:

" And if I send a manuscript to the printer of a periodical publication, and do not restrain the printing and publishing of it, I am the publisher."

That the article, as published in the Times-Herald, was the same as the manuscript article given by plaintiff in error to Varian, appears from the admissions of plaintiff in error, as testified to by Jackson, which admissions are uncontradicted, and also from the testimony of Reiwitch. The claim, therefore, that plaintiff in error was not connected by the evidence with the publication in the Times-Herald, can not prevail. It is contended here that no sufficient foundation was laid for the admission of the printed article; this objection was not made on the trial, but only a general objection, and the specific objection that the defendant had not been connected with the printed article. The evidence was not objected to on the ground that it was secondary evidence, and that objection can not successfully

be made here for the first time. Walsh et al. v. Wright, 101 Ill. 178; Condon v. Brockway et al., 157 Ib. 90.

But even though an objection sufficiently specific had been made, it is our opinion that, in view of the evidence, it would not avail plaintiff in error. It is objected that it was error to permit the examination of plaintiff in error as a witness. The reason assigned by counsel for this objection is that plaintiff in error could not be called on to answer any question the answer to which might tend to prove him the publisher of the alleged defamatory matter. The general rule in such case is that the party must, himself, claim his privilege under oath, and that the privilege being his, his attorney can not claim it for him. 1 Greenl. on Ev. 451; Odgers on Libel and Slander, Sec. 505; Shenck v. Shenck, 20 N. J. L. 208, 212; Commonwealth v. Price, 76 Mass. (10 Gray) 472, 476; Same v. Gould, 158 Mass. 499, 508.

Plaintiff in error did not claim his alleged privilege, nor did his counsel claim it for him, the objection being general and such as might be made in the examination of any witness. But it appears from the record that plaintiff in error was not entitled to claim the privilege contended for. He gave the manuscript to Varian July 11, 1896, and it was published in the Times-Herald the next day; the jury was impaneled January 13, 1898; the punishment for libel is a fine not exceeding $500, or confinement in the county jail not exceeding one year; libel, therefore, is merely a misdemeanor (Baits v. The People, 123 Ill. 428), and prosecution for a misdemeanor must be commenced within one year and six months from the time of committing the offense. 1 S. & C.'s Stat., Ch. 38, par. 497. The jury was impaneled January 13, 1898, and the prosecution was then barred, therefore plaintiff in error was bound to answer. Greenl. on Ev., Sec. 451, citing the People v. Mather, 4 Wend. 229, 252, 255, in which case the question is fully discussed and the text supported.

Questions material to the issue, and which merely tend to degrade the character of the witness, are not within the privilege. 1 Greenl. on Ev., Sec. 454.

On defendant in error offering in evidence the ordinance heretofore mentioned, prescribing the duties of city engineer, and showing that he is an officer in the executive department of the municipal government known as the department of public works, attorney for plaintiff in error objected to the evidence " as incompetent and immaterial under the pleadings in this case." The objection now made is that the ordinance was not pleaded. It is averred in the declaration that defendant in error was city engineer of the city of Chicago, and that the language complained of was composed and published of and concerning him as city engineer. The city engineer is not a charter officer, but such office may be created by the city council by ordinance. 1 S. & C.'s Stat., Ch. 24, par. 73, 74. The ordinance therefore was, as we think, competent under the pleadings to prove that there was such an office as city engineer, and if it was competent and material for any purpose, it was admissible in evidence. We do not think the objection made to the admission of the ordinance in evidence sufficiently specific to direct the attention of the court to the fact that the ordinance was not pleaded. The objection is that it was incompetent and immaterial " under the pleadings." Any evidence which is incompetent and immaterial is so under the pleadings. We can not perceive that the words " under the pleadings " render the objection specific; and that such an objection as is here made must, to avail plaintiff in error, have been specific in the trial court, is well settled.

Counsel contend that the article was privileged. That it was not absolutely privileged is too clear to admit of discussion. Odgers on L. and S., Sec. 183.

Can qualified or conditional privilege be claimed? The evidence is that at the time of the publication plaintiff in error was a brickmaker. As such he may have been interested in the construction of sewers; but he did not make the communication or publish the article to any one having an interest in the subject-matter corresponding with his interest, nor to any one who could redress the wrong, if any, nor was there any duty incumbent on him to make the

communication to Varian or to the Times-Herald. The communication, therefore, was not qualifiedly or conditionally privileged. Odgers on L. and S., Sec. 196, *et sequentes*.

But even though the occasion were privileged, this would not divest the article in question of its libelous character. Addison, an author quoted by counsel for plaintiff in error, says:

" A man has no right, as we have seen, to make himself the medium of propagating scandalous and defamatory accusations, unless he, himself, believes them to be true; and his belief is not an honest belief, if it is formed in a reckless and inconsiderate manner. If he has the means, by inquiry, of ascertaining whether the charge is true or false, and neglects to make inquiry, and exercises no effort to arrive at the truth, his belief can hardly be said to be an honest belief; for whoever publishes and circulates in writing, opinions and statements unfavorable to another, ought to be prepared to show that he had some reasonable grounds for it," etc. See also Odgers on L. and S. 199, and Newell on Defamation, etc., 504, *et sequentes*.

That the publication in question was recklessly and inconsiderately made, is abundantly proved by the testimony of plaintiff in error. He testified that he did not know Jackson, that he had no personal knowledge of, and that he made no investigation to ascertain the truth or falsity of the charge, although he had ample opportunity so to do. He testified that D. V. Purington was his informant; but Purington testified that he said nothing to plaintiff in error about Jackson and had never heard the latter's name mentioned in connection with the matter until the publication of the article. It would seem that the only privilege which plaintiff in error can legally claim in the premises is that guaranteed to all citizens by the bill of rights, namely: " Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty." Plaintiff in error has enjoyed the guaranteed privilege; if he has abused it, he can not avoid his consequent responsibility.

The first, second and third instructions for defendant in error are objected to because the word "libel" is used in them

with reference to the publication. The charge in the article is plain and unambiguous; it was, therefore, within the province of the court to determine whether it was libelous, and if libelous, to so instruct the jury. Hunt v. Bennett, 19 N. Y. 173; Pittock et al. v. O'Neill, 63 Pa. St. 253; Pugh v. McCarty, 44 Ga. 383; Gregory v. Atkins, 42 Vt. 237; Gottbehuett v. Hubachek, 36 Wis. 515.

No good reason is perceived for making alleged libelous publications an exception to the general rule that the interpretation of written instruments is for the court.

Instructions, substantially the same as the second and third instructions for defendant in error, were given in Sheahan v. Collins, 20 Ill. 325, and were excepted to, but the court affirmed a judgment for the plaintiff. The fourth instruction for defendant in error is also objected to. In Baxter et ux. v. Young, 44 Ill. 42, which was an action for slander, the court approved an instruction substantially the same as the fourth instruction, except that instead of the word "libel" the word "slander" was used in the instruction. Ib. 44.

We find no error in any of the instructions given for defendant in error.

Counsel for plaintiff in error, apparently relying on "An act in relation to libel," approved June 24, 1895, urges that there is no evidence of a demand in writing by defendant in error on plaintiff in error for a retraction, and therefore certain instructions asked by defendant below to the effect that punitive or exemplary damages could not be recovered should have been given. The act is as follows :

"Sec. 1. That in any action brought for the publication of a libel in any newspaper in this State, the plaintiff shall recover only actual damages if it shall appear at the trial of such act that such publication was made in good faith and that there were reasonable grounds for believing that the statements set forth in such publication were true, and that its falsity was due to mistake or misapprehension of facts, and that in the next two regular issues of said newspaper, after said mistake or misapprehension was brought to the knowledge of the publisher or publishers of such newspaper, whether before or after suit brought, a correc-

tion or retraction was published in as conspicuous a manner and place in said newspaper as was the libel.

Sec. 2.    No exemplary or punitive damages shall be recovered in any action brought for the publication of a libel in any newspaper in this State, unless the plaintiff shall, before bringing suit, give notice in writing to the defendant to publish a retraction or correction of the libel, and shall, before bringing suit, allow the defendant a reasonable time in which to publish such retraction or correction.    Proof of publication of such retraction or correction shall be admissible in evidence under the general issue in mitigation of damages, and in evidence of the good faith of the defendant, provided that the retraction or correction shall be published in as conspicuous a manner and place in said newspaper as was the libel.    *Provided*, that the provisions of this act shall not apply to the case of any libel against any candidate for public office in this State, unless the retraction of the charge is made editorially in a conspicuous manner at least ten (10) days before the election."    3 S. & C.'s Stat. 3779.

The Supreme Court of Michigan held, in Park v. Detroit Free Press Co., 72 Mich. 560, that a statute substantially the same, passed in 1835 (3 Howell's Annotated Stat. Mich. 3743), applied only to the publishers of newspapers.    We are of the same opinion in regard to the statute quoted *supra*.

Counsel for plaintiff in error object that one Ernst Lambrecht was accepted as a juror to try the cause, and that H. G. Lambert signed the verdict.    This objection is based on what appears in the transcript to be a copy of a paper purporting to be a verdict under which twelve names are written, one of which is H. G. Lambert.    This seeming copy is not in the bill of exceptions, is not a part of the record, and we can not consider it.    Lambert v. Borden, 10 Ill. App. 648.

The record proper shows that Ernst Lambrecht and eleven others were impaneled as a jury to try the cause, and that subsequently the jury theretofore impaneled came into court and announced their verdict.    The announcement of the jury in open court, which was received and recorded, is the true verdict.    Griffin v. Larned, 111 Ill. 432.

Numerous objections to rulings of the trial court, not mentioned in this opinion, were made by counsel for plaintiff in error, in none of which do we find reversible error.

Plaintiff in error objects that the damages are excessive. Counsel for defendant in error suggests that if the court should so think, it is within the power of the court to order a remittitur. Defendant in error introduced evidence showing that plaintiff in error was the owner of certain shares of stock subject to a mortgage of $6,900, and that he owned no other property. Estimating the shares at par and deducting the mortgage incumbrance leaves $11,700. No market value was proved. In view of this evidence, and other circumstances disclosed by the record, we think a remittitur should be ordered of $8,000. On defendant in error filing such remittitur within ten days, the judgment will be affirmed for $12,000.

Affirmed on condition.