## John Alexander Dowie v. Samuel G. Priddle.

### Gen. No. 11,356.

1. DEMURRER—*when overruling of, cannot be urged as error.* A defendant by pleading to the declaration thereby abandons a demurrer previously filed and overruled, and cannot subsequently assign error upon the action of the court in so overruling such demurrer.

2. MOTION FOR PEREMPTORY INSTRUCTION—*when overruling of, cannot be urged as error.* A demurrer to the evidence, or a motion for a peremptory instruction, (which are identical) when made at the close of the plaintiff's case, is deemed to have been abandoned by the subsequent introduction of evidence, and its denial cannot be urged as error.

3. VARIANCE—*when, cannot be urged as ground for reversal.* Where an alleged variance was not pointed out in the trial court, was not mentioned in the written motion for a new trial, and was not assigned as error, it cannot be urged as ground for reversal.

4. PLEA OF JUSTIFICATION—*what evidence competent under.* In an action for libel, based upon a general attack made upon the plaintiff's character, it is competent under a plea of justification only to prove the general reputation of such plaintiff, and proof of specific wrongful acts is not competent.

5. EXCEPTION—*essential to urge exclusion of evidence as error.* An exception to the ruling of the court in excluding evidence is essential to urge such action as error.

6. EXHIBITS—*when, improperly offered.* It is improper to offer *en masse* a large number of exhibits.

7. EXHIBITS—*when action of court in excluding, will not be reviewed.* It is essential, in order to review the action of the trial court in excluding a specific exhibit, to have the record correctly identify such exhibit.

8. LIBELLOUS ARTICLE—*right to read, to jury.* Either party to an action for libel has a right to read to the jury the entire article alleged to contain the libellous matter.

9. EVIDENCE—*must conform to pleadings.* It is proper to exclude evidence which does not conform to the pleadings, and the mere fact that the variance between the pleadings and the offered proof may be cured by amendment is immaterial.

10. LIBEL—*what words are actionable as.* In the case of oral slander, if the words uttered do not impute a crime, they are not, *per se,* actionable, and no recovery can be had without the averment of special damage. But an action for libel may be sustained for words published which tend to bring the plaintiff into public hatred, contempt and ridicule, even though the same words spoken would not have been actionable.

Dowie v. Priddle.

11.  LIBEL—*how question as to what is a, determined.*  Where the terms of the alleged libel are not ambiguous, it is a question of law for the court to determine whether the article in question constitutes a libel.

12.  VERDICT—*when, not excessive.*  A verdict of $2,000 in an action of libel, where no proof of special damage was made, held not excessive.

13.  WITNESSES—*when limitation placed upon number of, not error.*  In an action of libel, it is held not to have been error for the court to limit the number of witnesses which might be called by the defendant to testify as to the plaintiff's reputation, where it appears that the plaintiff upon his part called in support of his reputation less than half the number permitted to be called by the defendant.

14.  WEALTH OF DEFENDANT—*competency of evidence concerning, in action of libel.*  In such case it is competent to prove the wealth of the defendant as a basis for exemplary damages.

15.  ASSIGNMENTS OF ERROR—*when, deemed waived.*  Assignments of error merely referred to in the brief of counsel and not argued, are deemed waived.

Action on the case for libel.  Appeal from the Circuit Court of Cook County; the Hon. FREDERICK A. SMITH, Judge, presiding.  Heard in this court at the October term, 1903.  Affirmed.  Opinion filed October 4, 1904.

**Statement by the Court.**  This is an appeal from a judgment rendered in an action in case for alleged libel by appellee against appellant.  The suit was commenced November 21, 1901.  February 8, 1902, appellee, plaintiff below, filed an amended declaration, consisting of three counts. In each of the first two counts it is alleged, in substance, that prior to the grievances mentioned in the count, the plaintiff was a person of good name, credit and reputation, and enjoyed the good opinion and esteem of his neighbors and other citizens, and was engaged in the business of tool and diemaking, in the city of Chicago, Illinois, and also as a teacher, preacher and evangelist in said city, etc., and that the defendant, appellant here, was the general overseer and leader of a certain religious society known as the Christian Catholic Church, in Zion, many thousand members of which reside in said city and its vicinity; that plaintiff had been a short time prior to said grievances, a member in good standing in said society, and associated with the members thereof;

that defendant, before and at said time, was editor of a publication called "Leaves of Healing," a weekly paper for the extension of the Kingdom of God, which paper was the official organ and denominational paper of said Christian Catholic Church, and had an extensive circulation among the members of said church and others; that the Chicago Record-Herald and other secular papers of said city had, for a long period, severely criticised defendant concerning his religious work and leadership, and circulated a report of an alleged dream of plaintiff, in which the assassination of defendant was alleged to have been revealed to plaintiff; yet defendant, well knowing the premises, and wickedly and maliciously intending to injure the plaintiff in his business and in his profession, as a teacher, etc., wickedly and maliciously composed and published in said publication called "Leaves of Healing," of which he was editor, the false, scandalous, etc., matter following. In the first count the libellous matter alleged to have been published in the "Leaves of Healing" of June 1, 1901, is set out as follows:

"The murderous scribes of the press (meaning the reporters and other persons connected with the said secular press of the city of Chicago), have, week after week, during the month which has just passed, as well as in previous months and years, sought to stir up the people of every class in this city (meaning the city of Chicago), to acts of violence against Zion and ourselves (meaning said Christian Catholic Church in Zion and members thereof). They have incited, by direct words, the formation of mobs to murder the writer (meaning the said defendant). Only yesterday morning, the Chicago Record-Herald (now generally known as the Chicago Record-Mortgage), capped the career of crime upon which it has lately embarked, by a last bid to a vile person named Samuel G. Priddle (meaning the said plaintiff), to carry out his diabolical dream of our assassination (meaning the assassination of defendant among others), during the month of May, which prophetic lie, Victor Lawson and his crew (meaning the persons interested in the publication of the said Record-Herald), have again and again given great prominence. We will clip from the Record-Mortgage of yesterday morning, Friday, May 31st, in full, its last bid to this murder:

Dowie v. Priddle.

"'Dreams Death to Dowie.'

"'Samuel G. Priddle, a West Side prophet, claims to have had two dreams in which the assassination of Dr. Dowie was revealed to him. He states that he has written letters to Dr. Dowie in which he told of his visions and asked for an interview. The interview Dowie has declined. Asked when he hoped to have the meeting with Dr. Dowie, Mr. Priddle said that would be arranged by God, as indications point to this month being the time when the Almighty was bringing things to a climax in regard to Dr. Dowie and Zion. He thought the interview might occur in court. After the interview, he says, Dowie will be assassinated in Michigan avenue, just south of the Tabernacle. Who would assassinate Dowie, Priddle could not say. Priddle is a tool-maker and a die-sinker, thirty-five years old, very pious, a good conversationalist, and appears to be above the average intelligence.'

"The Chicago Tribune (meaning another of the secular newspapers of said city), boldly bid, as we set forth fully in our editorial notes of last week, for some one to murder us. This was followed by many of the other newspapers, the Journal (meaning another of the secular papers of the said city) especially, giving prominence to Priddle's murderous and diabolical prophecies (meaning the alleged prophecies of said plaintiff).

"We will now tell our readers and the people generally, who this 'Priddle' is, and what we know of him (meaning the said plaintiff). He is the very opposite of pious. He is not a good conversationalist. He is not 'above the average of intelligence.' He is a poor, ungrammatical ignoramus, who has printed and published some of the most nonsensical trash that ever left a mean little job printing press, too cowardly to put its imprint upon it. Priddle is well known to us. He was once, for a short time, a member of the Christian Catholic Church in Zion, having entered it upon a false profession. He was expelled by the Overseer for Chicago (meaning the said plaintiff), was expelled from the said religious society known as the Christian Catholic Church in Zion, by the Overseer of said Church in the District of Chicago, while the writer (meaning the said defendant), was in Europe, and from henceforth he has been held by Zion (meaning said religious society and denomination), to be 'as a heathen man and publican' of the worst kind (meaning thereby that said plaintiff was a sinner of the vilest type). His expulsion was the occasion of his let-

ting loose upon us and Zion all the hatred of his insanely wicked heart. For weeks past the daily press has meanly used him as its tool, and has published widely his vile prophecy that we should be assassinated in front of Zion Building, on Michigan avenue, during the month of May."

In the second count, next after the allegation in the inducement above mentioned, in respect to the alleged dream of the plaintiff, is the following: "And whereas, on, to wit, the 28th day of October, 1893, Carter H. Harrison, Sr., then mayor of the city of Chicago, was assassinated by one Patrick Eugene Prendergast; and whereas, the said Prendergast was apprehended and indicted on the charge of having murdered said Harrison, and was on, to wit, December 29, 1893, convicted of the murder of said Harrison, and thereafter suffered the penalty of death therefor." The alleged libellous matter in this count is stated to have been in the "Leaves of Healing" of date June 22, 1901, and is set out as follows:

"The man who intends to murder me (meaning the said defendant) will not send me a letter telling me what he contemplates doing. My life is fairly safe so long as it is threatened only by writers of letters who decorate their stationery with skulls and cross-bones. But there is the other fellow for whom you have to look out, the insane fanatic, like this scoundrel, Priddle (meaning the said plaintiff). The papers (meaning the secular press) have been talking about him (meaning the said plaintiff), and publishing his wretched prophecies (meaning the said alleged dream of the said plaintiff) that I (meaning the said defendant) was to be murdered in the month of May, and then on the last day of May, telling the place where I was to be murdered. Why did they (meaning the said secular papers) do that? Why did they publish a prophecy? In the hope that Priddle (meaning the said plaintiff), poor, insane lunatic that he is, would do the murder? He has not spunk enough to do it. He is a low, mean coward. They (meaning the said newspapers) have only to keep at him, and to keep at him, and they think they may get him, or some other paranoiac, to do it. I desire to tell that scoundrel Priddle (meaning the said plaintiff), if he is in reach of my voice (said words having been delivered as a part of a public address some time prior to their said publication),

or hears of what I have said, that there is a limit to our patience, and that one of these days, for his sake as well as for Zion's sake, we (meaning the people of said Christian Catholic Church) may take hold of him and put him (meaning the plaintiff) in prison to cool his heels for awhile. Dangerous characters like Prendergast (meaning the said Patrick Eugene Prendergast, and that this plaintiff is a person of like character), who murdered Mayor Carter H. Harrison, Sr., at the close of the World's Fair (meaning the said crime of murder committed by the said Prendergast, and for which the said Prendergast was convicted and suffered the death penalty as aforesaid), are numerous in all large cities. They get insane and devilish notions into their heads, and the papers incite them. (The said defendant further meaning by the words aforesaid that the said plaintiff had entertained and then entertained murderous intention and motives to kill said defendant, and he would have executed such intentions and motives, had he the physical courage or 'spunk enough to do it,' and meaning further that the said plaintiff had threatened the life of the said defendant, and that the said plaintiff was such a vile and wicked person that he might have been easily incited to assassinate the said defendant, and also further meaning other libellous things apparent without innuendo.)"

The inducement in the third count is substantially the same as in the first, except that it omits mention of the criticism of the defendant by the newspapers, and the alleged dream of the plaintiff. The matter in this count relied on as libellous, is alleged to have appeared in the "Leaves of Healing," July 13, 1901, and is set out as follows:

" A prophet, however, who rises up and tells you that he is a prophet, is a prophet of the gutter, like that wretched Priddle (meaning the said plaintiff). He is a prophet of the slums, a prophet of the brothel, a prophet of adultery, a prophet of damnation. What kind of a prophet is he? (meaning the said plaintiff, and meaning a prophet like that ' wretched Priddle.') A prophet after the order of Joseph Smith, who wallowed like a sow in the filthiness of his own accursed polygamy, and told the church to which he ministered that the woman who would agree to her husband having the largest number of wives would be of high rank and a queen in heaven. A dirty dog! That prophet is a

false prophet. He is as false as Mohammed, who tells you that the reward of the faithful will be to wallow in luxury and debauchery with countless harlots in Paradise. Such a prophet is a prophet of the gutter, of the swine-trough, of filth and damnation. (Meaning thereby among other libelous things, apparent without innuendo, that the said plaintiff in his said profession as a Christian teacher and religious leader, is a low, degraded person, lewd and depraved, and a teacher of lewd, adulterous and polygamous practices.)"

In each of the counts, and next following the alleged libellous matter, it is averred, in substance, that the defendant sent the said "Leaves of Healing," containing said matter to his subscribers and others, and that the same was received and read by them.

The defendant pleaded the general issue, and a special plea of justification to each count, alleging the truth of the matter set out in the count. The plaintiff rejoined to the general issue, and replied *de injuria*, and also specially to the special pleas. Subsequently, a demurrer was sustained to the special replications. The jury found the defendant guilty, and assessed plaintiff's damages at the sum of $2,000. Motions for a new trial and in arrest of judgment were overruled and judgment was entered on the verdict.

V. V. BARNES, CHARLES E. LAUDER and P. R. BARNES, for appellant.

FREDERICK MAINS, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

The record in this case is extraordinary. Having carefully examined it, we are fully prepared to sympathize with the presiding judge of the trial court, who, while the trial was dragging its slow length along, remarked to the attorneys of the parties, "If you keep on, I will be as crazy as the rest of you; I will begin to see visions." In view of the record and the manner in which the case is presented for the defendant, we will, in accordance with the rule that whatever is not argued must be deemed waived (Gordon v. Commissioners, 169 Ill. 510), confine this opinion mainly to matters relied on in argument.

The following objections will be considered *seriatim:*

1. "The demurrer to the amended declaration should have been sustained." The declaration is substantially good, and the defendant, by pleading to the amended declaration, abandoned his demurrer, and cannot assign the ruling as error. C. & A. Ry. Co. v. Bell, 209 Ill. 25.

2. "Pleas having been filed and issue joined, defendant's demurrer to evidence should have been sustained at the opening of the trial." Taken literally, this is nonsense. There could have been no demurrer to evidence at the *opening* of the trial. After the plaintiff rested, the defendant demurred to the evidence, and the court overruled the demurrer, when the defendant, instead of standing by his demurrer, proceeded to introduce evidence on the merits, thereby abandoning the demurrer, and went to the jury on the merits.

3. "The evidence shows a fatal variance." In support of this objection it is contended that in the several counts of the declaration, certain paragraphs of the alleged libellous matter, directly connected with the matter set out, are omitted. We would have no difficulty in answering this objection if it were properly before us; but the variance, if any, was not pointed out on the trial, is not mentioned in the written motion for a new trial or assigned as error, and therefore cannot be considered here. Swift & Co. v. Rutkowski, 182 Ill. 18; R. R. Co. v. McMath, 91 Ill. 104.

4. "The declaration fails to allege proper inducement and innuendo." "There is no proper allegation of damage in the declaration." We find no substantial defect in the declaration, and that there is none has been held against the defendant, on demurrer, to which he submitted, as heretofore stated.

5. "The court erred in refusing to admit the various facts and acts offered by defendant and set up in the plea of justification, and in refusing to receive proof, duly offered, that such facts were brought to the knowledge of defendant before the publication of the alleged libellous matter set up in all of the counts in the amended declaration; and

erred in refusing to permit defendant to show that he was conversant with such facts before the libel set up in the first count, including the offer of defendant to prove the desertion by plaintiff of his wife prior to such publication, and including the fact of plaintiff's admission of adultery, made to defendant's knowledge prior to such first publication." This general objection is not argued. In support of it, we are referred to page 181 of the abstract, from which and preceding pages, it appears that defendant's attorney offered in evidence, *en masse*, a large number of newspaper clippings, etc., which the court excluded, but, erroneously, as we think, permitted the defendant to prove that they were read by the defendant prior to the publications complained of. The clippings seem to have been contained in a scrap book, and were not offered separately, but all together, and six of them are not abstracted.

In the alleged libellous matter set out in the several counts of the declaration, the plaintiff is not charged with any specific wrongful act. His general character merely is attacked, and the court held that, under the pleadings, the defendant, in attacking plaintiff's reputation, could not prove specific acts, but was limited to proof of his general reputation, which seems to be the law. Sheahan v. Collins, 20 Ill. 326; Strader et al. v. Snyder, 67 ib. 404.

It is true that in the cases cited, *supra*, the general issue only was pleaded, while in the present case there are pleas of justification averring the truth of the libellous matter, some of which pleas charge specific acts, *ex gr.* that plaintiff deserted his wife, and that he committed adultery; but a plea of justification in such case as the present, is limited to averring the truth of the charge, and must do so directly, and the averment of specific wrongful acts, not alleged in the declaration to have been contained in the libellous matter complained of, is clearly improper, and no answer to the declaration, and the court may properly disregard such averments. In the present case, the presiding judge said, on the trial, that the demurrer to the special replications should have been carried back to the special pleas. The

language of the court in Sheahan v. Collins, *supra*, is applicable in such case: "But it is a general rule that the character of either a witness or party cannot be impeached by special acts, for no man is supposed at all times to be prepared with the proof to meet every individual act, but is presumed, at all times, to be prepared to support his general character."

In Proctor v. Houghtaling, 37 Mich. 41, the defendant was sued for verbal slander, charging the plaintiff with adultery, and of being a woman of gross unchastity. The defendant pleaded the general issue, and gave notice of justification, which notice contained a number of charges against the plaintiff, none of which was an issuable allegation of misconduct, such as charged in the slanderous statement. It was held error to admit evidence of the charges in the notice, the court saying: "Nothing can be clearer than that the office of a notice is to present tangible issues, and not to introduce matters which form no part of the issue. Matters cannot be made relevant merely by insertion in a notice. That which would be immaterial in a plea cannot be material under any form of issue. In an action of slander, there can only be two issues—one of its publication, and the other of its justification. Upon the trial, where there is no justification, there may be matters in mitigation, but these are not put in issue because they form no absolute defense. It would be very dangerous to allow issues to be made on the trial concerning specific acts of the plaintiff, or specific rumors, or charges against her not going to the direct issue in the cause. She could have no means of defense against malicious fabrications, which are by no means unusual in such cases, and the reputation of the purest person could easily be ruined or damaged by allowing free scope to such testimony. As has often been remarked, the general reputation of any one may be expected to be within the knowledge of attainable witnesses at all times, but it would be impossible to be prepared for all the particular slanders which perjured and malicious witnesses might invent. A large mass of such rubbish has been introduced

into this case, without any respectable authority to maintain its reception.    The practice is not to be commended."

In Fountain v. West, 23 Ia. 9, the court say:  "We are aware of no rule of law, and appellants have cited no case, which would allow proof to be made of specific offenses and particular acts of dishonesty not connected with the transaction under investigation."

6.    "The court erred in excluding transcript of the record of divorce proceedings in suit of plaintiff's wife against him."    There is no ruling of the court nor exception shown in the abstract, in respect to said transcript.    Therefore the objection cannot be considered.

7.    "The court erred in refusing to admit exhibits 1 to 9, offered in evidence by defendant."    The exhibits referred to were not offered separately.    The defendant's attorney offered in evidence a pamphlet, which the court excluded, and defendant's attorney excepted.    The pamphlet was not marked for identification, and is not in the record, but defendant's counsel assume here, that exhibits 1 to 9 were contained in the pamphlet.    These exhibits are a heterogeneous mass of what may well be denominated rubbish, covering some twenty-four pages of the abstract, and assuming they were contained in the excluded pamphlet, of which there is no proof, they were offered *en masse*, and for that reason, and their incompetency, were properly excluded. Defendant's attorney also offered in evidence, all together, a large number of letters, which the court properly excluded. Whether the letters were or were not in the pamphlet, we cannot determine from the abstract.

8.    "The court erred in overruling testimony offered by defendant as to article entitled, 'Dreams Death to Dowie.'"    We are referred to page 173 of the abstract for the so-called "testimony," and find there a copy of an article published in the Record-Herald, and purporting to be the report of an interview with plaintiff in respect to a dream which he had.    We think it was properly excluded.

9.    The plaintiff introduced a large mass of "testimony" against defendant's objection, etc.    This refers to extracts

read by plaintiff's attorney from "Leaves of Healing," of date June 22, 1901, and defendant's counsel claim that the matter read is not warranted by the pleadings. The issue of "Leaves of Healing" of June 22, 1901, contained one of the articles containing libellous matter counted on, and it appears from the record that appellee's attorney read part of the article, and that it was substantially agreed on by counsel, with the sanction of the court, that the attorneys for the parties might read such parts of the article as they chose. As matter of law, either party had the right to read the entire article containing the alleged libellous matter. Newell on Defamation, etc., p. 760, sec. 12.

10. "The court erred in sustaining objection to the testimony of Oliver Davis." The following question was asked the witness by defendant's attorney: "If you had a conversation with the plaintiff, Priddle, at any time prior to June, 1901, in which Mr. Priddle referred to the fact that he had a vision, or a dream, to the effect that Mr. Dowie was to be killed near the tabernacle on Michigan avenue, during the month of May, 1901, tell who it was that he said was to do the killing?" The court sustained an objection to the question, correctly, as we think. The witness was not asked to state the conversation, but merely, if he had such a conversation, to state who Priddle said was to do the killing. Also, in the defendant's special plea it is expressly averred that the conversation between plaintiff and Davis occurred some time in the autumn of the year 1901, which was after the first publication, and that objection was made. Counsel for defendant now say the plea might have been amended, but it was not.

Counsel for defendant in their reply brief contend that the damages are excessive, and urge as reasons for the contention that the defendant published the words in good faith, and that the published words are not actionable without proof of special damage. Whether the words were published in good faith was a question for the jury. In Harkness v. Chicago Daily News Co., 102 Ill. App. 162, we held adversely to the second reason urged by counsel,

saying : "It has never been the criterion in determining the actionable quality of printed words, that they should import the commission of a crime, and the authorities are uniform that a writing may be libellous and actionable without proof of special damages, even though it contains no imputation of crime."

Counsel contend that the words are not actionable without proof of special damage. We think that counsel, in thus contending, have failed to discriminate between oral and written or printed words. In the case of oral slander, if the words uttered do not impute a crime, they are not, *per se,* actionable, and no recovery can be had without averment and proof of special damage. Strauss v. Meyer, 48 Ill. 385. But "an action for libel may be sustained for words published, which tend to bring the plaintiff into public hatred, contempt and ridicule, even though the same words spoken would not have been actionable." Cerveny v. Chicago Daily News, 139 Ill. 345. The published words charged in the declaration tend to bring the plaintiff into public hatred, contempt or ridicule. We cannot hold that the assessment awarded as damages is excessive.

Counsel for defendant object that the court erred in limiting the number of defendant's witnesses as to the plaintiff's reputation. The defendant called eight witnesses who testified that plaintiff's reputation was bad, and the plaintiff, only three to the contrary. We fail to see that the court abused its discretion in the matter, or that the defendant has any good reason to complain of the ruling. The defendant has omitted from his abstract the following important evidence, necessary to be considered by the court. It was agreed between counsel on the trial, that the defendant was worth several millions of dollars; that the defendant was the author of the three articles complained of in the declaration, which were published in the "Leaves of Healing," and that he was the editor, proprietor and manager of said paper; that, just prior to June 1, 1901, the regular circulation of "Leaves of Healing" was 40,000 per week; that each number had an average of five readers,

and that there were 200,000 regular readers of "Leaves of Healing."

Lastly, counsel complain in respect to the instructions. It is objected that instructions 1, 4 and 5 for the plaintiff are erroneous. The first sentence of instruction 1, which is as follows, is criticised by counsel : "If the jury believe from the evidence, that the defendant published the libel, as charged in the declaration, then the plaintiff is entitled to recover in this suit." The objections are that the instruction assumes the matter alleged in the declaration to be libellous, and withdraws from the jury the question of its falsity. It is not contended that the alleged libellous matter set up in the declaration, and admitted to have been composed and published by the defendant is ambiguous, as it clearly is not; and therefore it was within the province of the court to determine whether it was libellous. "When the defamatory matter is plainly unambiguous, the question of its meaning and character is for the court; but where its meaning is ambiguous, then the question is for the jury." Newell on Defamation, etc., p. 290.

In Over v. Schiffling, 102 Ind. 191, 197, the court say: "A written instrument is to be construed by the court and not by the jury. It was for the court to instruct the jury as to whether the letter was or was not libellous," citing prior Indiana cases. See, also, Prussing v. Jackson, 85 Ill. App. 324, 340, and cases cited.

The question of the truth or falsity of the alleged libellous matter was not taken from the jury. The language is : "If the jury believe from the evidence that the defendant published the libel *as charged in the declaration.*" It is charged, in substance, in each count of the declaration, next preceding the alleged libellous matter, that the defendant wickedly and maliciously composed and published of and concerning the plaintiff, a certain false, scandalous, malicious and defamatory libel, containing, among other things, the false, scandalous, malicious, defamatory and libellous matter following.

In C. & A. R. R. Co. v. Fisher, 141 Ill. 614, 624, the fol-

lowing instruction was objected to, as assuming the negligence of the defendant: "If the jury believe from the evidence, that the plaintiff, while in the exercise of ordinary care, was injured by or in consequence of the negligence of the defendant, as charged in the declaration, or either one of the counts thereof, then you should find the defendant guilty." · The court say: "The instruction does not assume that appellant was guilty of negligence, for the qualifying words, 'if the jury believe from the evidence,' apply to the entire sentence."

We think the objection of counsel to plaintiff's instruction 4 untenable. The same objections are made to the fifth instruction as to the first, and it is also objected that the instruction tells the jury that, if they find the issues for the plaintiff, and believe from the evidence that the publication was made maliciously or wantonly, and under circumstances evincing a disregard for the rights of others, then, in making up their verdict, they might take into consideration the circumstances of the defendant as to wealth and possession of property, so far as they appear from the evidence. Counsel contend, in reference to the instruction, that the case is not one in which punitive damages can be allowed, and that it was error to refer to defendant's wealth, which was admitted on the trial, as counsel admit in their argument. Whether the evidence was such as to warrant an assessment of exemplary damages was a question for the jury, under the instructions of the court. In case of slander, evidence that the defendant is wealthy is admissible. Flagg v. Roberts, 67 Ill. 485; Hintz v. Graupner, 138 ib. 158, 165.

In the present case it appears by defendant's admission, made by his attorney on the trial, that·he is the author of the libellous matter, and published it in his own paper, and the evidence further shows that he spoke it publicly before publishing it in his paper, "Leaves of Healing." Under such circumstances, we can perceive no sound reason for his exemption from the rule applicable to cases of oral slander, viz., that the financial responsibility of the slan-

Dowie v. Priddle.

derer may be considered by the jury in assessing damages. But if a distinction can be made in this respect, in any case, as between the publisher of a newspaper containing the defamatory matter, and a slanderer by word of mouth, we think defendant precluded by his admission of wealth from availing of such distinction in this case. The only purpose of the admission as evidence, is to use it to enhance the damages, in the event of a verdict against the defendant, and both court and counsel must have so understood. After allowing his admission to go to the jury as evidence, and it being relevant as evidence for the sole purpose for which it was used, which was well known to the parties and the court, it is little, if any, less than a fraud on the court to claim that the court erred in applying it as intended by all concerned.

Counsel complain of the refusal of the court to give certain instructions for the defendant as asked, and in modifying them and giving them as modified.

The abstract recites the asking of instructions 1 to 12, both inclusive, by defendant, and that the court refused to give the instructions as asked, but modified them and gave them as modified; but what the modifications were, is not shown. The abstract merely shows the instructions as given. Therefore we cannot pass on the objection. In calling our attention to alleged errors of the trial court, defendant's counsel, in their argument, have in many instances merely stated that the trial court erred in its ruling, without argument or explanation, as, for instance, "The court erred in refusing to admit exhibits 1 to 9, offered in evidence by defendant. (R. 296 to 335; Abst. 114 to 138.)

"The court erred in overruling testimony offered by defendant as to article entitled, 'Dreams Death to Dowie.' (R. 399; Abst. 173.)"

It is the duty of counsel, presumably familiar with the case in which they are engaged, to enlighten the court in regard to the cause, and to aid the court in its investigation. In City of Chicago v. Spoor, 91 Ill. App. 472, the court, Mr. Justice Windes delivering the opinion, say: "It is not

enough for counsel to say in his brief that the court erred in giving a specific instruction, or in the admission or exclusion of certain evidence, or that the judgment is excessive, or that the court should have sustained a motion for a new trial, but he should show how, or in what way the particular ruling of the court was erroneous."

A motion made by appellee to dismiss the appeal was reserved to the hearing. The motion will be overruled, and the judgment will be affirmed.

*Affirmed.*